## LAW OFFICE OF SAM A. SCHMIDT

**115 BROADWAY**
**NEW YORK, N.Y.  10006**
**(212) 346-4666**
facsimile (212) 566-1068
**Email lawschmidt@aol.com**

**Sam A. Schmidt, Esq.**

**Hiba Mohammad,  Paralegal**                                  .

September 8, 2016

Honorable Carol B. Amon
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, N.Y.  11201

Re*: United States v.  Allen Chen*
        15 Cr. 628 (CBA)

Dear Judge Amon:

        This letter is submitted in reply of the government's August 18, 2016 letter and the August 17, 2016 addendum to the presentence report (PSR).  Additionally, I am attaching Mr. Chen's letter to your Honor as well as letters from his family, his ex-wife and friends.[1]   While Guidelines calculations do play a role in the determination of the appropriate sentence, as discussed in the initial submission, it is our belief that further incarceration is more than necessary to achieve the purposes of sentencing under 18 U.S.C. § 3553(a) regardless of the Guideline range.

---

[1] The letters, Exhibit G,  were translated by Lily Lau. Because the letters had many similarities and were so effusive in support of Allen Chen, I asked Lily Lau to speak with the letter writers to confirm that the letters were genuine.  Earlier today Ms. Lau told me that she has confirmed that the letters and information in the letters  were genuine.

LAW OFFICE OF SAM A. SCHMIDT

## Role in the Offense Adjustment

In its letter, the government argued that the cases cited by the defendant for a role in the offense reduction were "inapposite." It noted that Chan was a courier who brought drugs to an undercover agent "without saying a word during the entire transaction." Not included in the government's description was the sentencing judge's statement that

> Here, Chan flew from Hong Kong to New York only for the purpose of assisting in a sixteen kilogram heroin transaction. He possessed keys for both hotel rooms, accompanied Wong at 5:00 a.m. to meet Special Agent Shum, traveled with Wong by taxi to pick up two knapsacks containing sixteen kilograms of heroin, and returned with Wong to meet the undercover agent and complete the delivery.

*Chan v. U.S.*, 916 F. Supp. 343, 349 (S.D.N.Y. 1996).

As for Trouche, the sentencing judge noted that Trouche continued to use a false identity and his real identity was never known, thus his actual role was unknown.  The only information available to the sentencing judge was provided by the agents and defendant's own mitigating statement after arrest. The judge's four level reduction based upon the following

> At around 8:30 p.m. the officers noted Troche driving a black Lincoln Town car as he circled the block several times speaking on a cellular phone. Troche appeared to be nervously looking for someone or something. He was observed to meet with an individual who remained outside the car. Officers approached the two, and the individual fled. A consensual search of Troche's truck produced a suitcase containing $500,000 in U.S. currency. Troche stated that he had been instructed by a livery customer to deliver the suitcase from Washington Heights to 72nd Street and that he believed it was the proceeds of criminal activity.

2

LAW OFFICE OF SAM A. SCHMIDT

*U.S. v. Troche*, 01 CR 274 01 (RWS), 2003 WL 223468, at *1 (S.D.N.Y. Jan. 31, 2003).

Importantly, these cases were decided prior to the November 1, 2015 Guidelines amendment that provided a much more generous definition of the mitigating role adjustment, and the commentary by the Commission that the "mitigating role is applied inconsistently and more sparingly that the Commission intended." *U.S.S.G. App. C amend. 794 (reason for the amendment.) See also* Guideline Manual 2015 Edition at xvii.

The government's factual arguments are equally misleading and unpersuasive.  Mr. Chen has always acknowledged that he provided information about the milk tea and  promoted the sale on behalf of his cousin. The information he passed on to the CW was not based on his experience but upon his conversation with the supplier.  Importantly, it was the CW trying to reach Mr. Chen on the telephone two times after the delivery, not Mr. Chen seeking to contact the CW. Had the CW not called Mr. Chen, he would have had no further contact with the CW or with the "milk tea."

The government argued that the defendant's response "Yeah, yeah, yeah.  If ... whatever ..."[2] to the CW's call to defendant and statement after trying to reach "the boss" that "[i]n a day or two .... I'll go over and do the calculations with you in a day or two," demonstrates Mr. Chen's financial interest in the transaction. Such a response, especially combined with the other statements, is not of someone who has any interest or involvement with the money.  *See* Govt Ex at p. 6 and at p. 7. *See also* Govt Ex at p. 16 ("... I happened to call your Dai Lo earlier. He is in Flushing. I'll bring the money him (sic) later."

The addendum to the PSR acknowledged that Zheng  "told the source to call Allen Hui Chen" is inaccurate. However, the addendum states that "it is more accurate to say that Qian Zheng 'told the source to get in touch with Allen Hui Chen" because the defendant called the cooperating witness to set up the drug deal." This does not make sense nor is it accurate. The May 20, 2015 transcript,

---

[2] The government neglected to include the word "whatever" in its letter.

3

LAW OFFICE OF SAM A. SCHMIDT

attached as Exhibit F, has no indication of Zheng using Mr. Chen or anyone else's name.  As Mr. Chen has acknowledged and is confirmed by the May 21, 2015 transcript, Govt Ex  at page 4, it was Mr. Chen who called to arrange to meet the CW pursuant to the instructions given him.  When Mr. Chen and the CW met, the CW asked the defendant "Where's the boss?" Clearly, he was expecting to do business with Zhang. Gov't Ex page 4.

Though it is clear that Allen Chen is not a member of a Racketeering Enterprise, both the government and the PSR seek to associate him with the "violent criminal organization referred to as the 'Zheng Organization.'" Undoubtedly, your Honor has become familiar with the alleged criminal activities of the participants during the pendency of the case. Had Allen Chen truly been an "associate" or member of this criminal organization, he would have appeared in something more than one delivery and two telephone calls initiated by the CW. He is not seen nor heard from in any other aspect of this "violent criminal organization."  In fact, had he arrived in New York by bus in the early morning hours of May 22, 2015 instead of May 20, 2015, there would have been no mention of him at all.[3] And he was a **voluntary** witness against a leader of a different Chinese gang, conduct that is inconsistent with membership in a "violent criminal organization."[4]

**Safety Valve**

Most of the government's argument as to the safety valve relates to Mr. Chen's desire not to say his cousin's name during a safety valve proffer. However, there is no doubt that the "boss" referenced is Zheng, and the acknowledgment of the reliability of the recordings make it clear that it was Zheng.  Further, the government complaint that it was unable to follow up or test Mr. Chen's statements is not accurate. In my letter to the government I stated

---

[3] *See* copy of redacted MasterCard statement, Exhibit H.

[4] Undoubtedly, members of violent criminal organizations do testify as cooperators in order to reduce their sentences, but I know of no such member voluntarily coming to the United States to testify.

LAW OFFICE OF SAM A. SCHMIDT

> I will sent forth all that Allen Chen knows of the offense and
> related conduct and hope that you will accept it as an adequate
> safety valve proffer. If you have any questions other than the name
> of Zheng, please let me know and I will seek and answer from my
> client.

Exhibit B.  More importantly, Mr. Chen was always available to do the safety
valve proffer as long as he was not required to use the name of his cousin.

**Medical Condition**

We have sought records from the company that is responsible for the
storage of records of his retired doctor in Canada but have not received them. Mr.
Chen was able to obtain a document from China that reflects that he is a carrier of
Hepatitis B. We are presently having it translated.

**Letters from Family and Friends**

These letters demonstrate that other than involving himself in the affairs of
his cousin, Allen Chen is a decent, caring person. He has always been willing to
help others.  As a result, others were willing to help him. We had many people
willing to sign the bond for him, including his ex-wife. I personally spoke with his
ex-wife and one of his friends in Canada.  Ms. Lau spoke with family in China. All
held Mr. Chen in high esteem. They were not able to sign a bond for him because
they did not live in the United States.

## CONCLUSION

Allen Chen once had an important connection to New York, his
girlfriend/fiancé Evonne Meng.  He had family, his cousin Qian Zheng, and his
family.  Now, he has no ties to New York.  He has spent time in jail, and months
alone in a small apartment.  He has had no medical examinations since his arrest.
At some point, Allen Chen, will return to Canada and restart his life. He hopes that
it will be soon.

**LAW OFFICE OF SAM A. SCHMIDT**

I do not argue that some additional incarceration for Mr. Chen's conduct is unreasonable.  However, for this forty-three (43) year old first offender who clearly played a subservient role to his cousin and is no threat to repeat his unlawful conduct, further incarceration will achieve little.  He is ashamed of his conduct and has brought distress to his parent, his son and others who held him in high esteem.

Further incarceration within the Guideline range will send no message to those who are active in the drug trade. The time he has spent in jail and home detention, the loss of respect and difficulties that result from his felony convictions, and the loss of the privilege to travel to the Unite States, however, would act as a sufficient deterrent for someone like Allen Chen. While additional incarceration may not be unreasonable, it is unnecessary.

Thank you for your Honor's consideration in this matter.

Sincerely yours,
/s/
Sam A. Schmidt

6